The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. You may be seated. We'll call the third case, number 256634, Marcus Ingram v. Israel Hamilton et al. Dr. Carroll. Yes, Your Honor, Seth Carroll on behalf of Mr. Ingram. Let me just say what a privilege it is to be here arguing today and always a pleasure to deal with the Attorney General's Office, who allows you to dispute issues without becoming personally adversarial. This case is not about whether prisons may respond to contraband. It is not about whether visual strip searches can ever be used in prison. They can. And it is not about whether a search of some kind before a no-contact video visit might be reasonable. The question is narrower. It's whether appellees are entitled to summary judgment on a policy requiring repeated strip searches before and after no-contact visits. And in particular, when the determination regarding the justification factor under Bell and the rational relationship factor under Turner really turn on a dispute of fact, which is whether or not it is possible to— Why would we apply Turner at all? Isn't it clear that Bell is what's applicable here? So this Court and the United States Supreme Court have leaned on Turner in cases involving policy. Bell is a case that analyzes the reasonableness of a particular search, and Turner is helpful in determining the constitutionality of a particular prison policy. So they can be used together. There's no tension between applying both tests in a case like this, which involves a policy for strip searches rather than just— But Bell addresses the factors to be considered in strip search scenarios, correct? I think the justification factor in Bell relates to the strip searches themselves, yes, and the particular search aspect of that. But Turner is informative when a policy is involved because it really allows the Court to analyze— Why are you pushing so hard for Turner? Do you not think you can win under Bell? No, we can win under Bell, but I think Turner is applicable. This Court referenced Turner in Johnson v. Robinette. The United States Supreme Court referenced Turner in Florence. Turner is referenced in these— I think Turner hurts you. How is that, Your Honor? Well, I don't know how to explain myself. I'm here to ask questions. Well, one reason— I'm just observing. I understand. Turner says the warden runs the prison, basically, and you're suing the warden. Correct, Your Honor. That's right. But Turner doesn't allow the warden to institute policies simply by espousing— The Turner second factor doesn't apply in this scenario at all because that's— the second factor is whether an inmate retains alternative means of exercising a right, but there's no right being exercised here. Well, it's tricky in this case because— Tricky because it doesn't apply. Maybe just focus on Bell if you think you can win there. I will focus on Bell, Your Honor, but I do think Turner is informative to understanding this idea of when an on-its-face and articulated legitimate penological purpose is justified under the circumstances. And I think because this court and Florence have talked about— Now, we're talking strip searches at the Keene Mountain Prison. Yes, sir. And the Keene Mountain Prison is way out in western Virginia, correct? Yes, sir. It's not very far from the southern counties of West Virginia or from the eastern counties of Kentucky. Is it the maximum security prison for the Commonwealth of Virginia? That would be Red Onion, I think, in Wallens Ridge. Well, there's both out there. And Keene Mountain is a little north of Red Onion, I think. But they're both maximum security prisons, I think. And your fellow has been in there since at least 2005. I don't know how many years he's been in there, but he's been in there a long time. Yes, Your Honor. I'm not sure it's in the record how many years he was in there or how long he had been in there. What specifically did the judge do wrong here? Right, Your Honor. So what the judge essentially did was assume one fact that was an issue for the jury to resolve in this case and applied that fact in determining the reasonableness or the justification for these searches. How do you get a jury trial here? You've got to have a constitutional violation, and you have to have something that's not established, a constitutional right that's not established. Right, Your Honor. That's a constitutional right that's clearly established here. The right to be free? Well, first of all, Your Honor, that a strip search involves an invasion of bodily privacy under the Fourth Amendment. The mayor, the warden, said that he had information that there were drugs in the facility, and he wanted to stop it. Yes, Your Honor. So a lot of questions there. Let me try to get to all of them, Judge King. First of all, it is for the jury ultimately to determine should there be material facts in dispute, whether there was a constitutional violation. That's how you get to a jury, and it's the appellant's position in this case. And in a maximum security facility, the mayor or the mayor, I call him the mayor, the warden has a lot of discretion. And here they only did this thing for what, 30 days or 60 days? 60 days. That's right, Your Honor. Yes, sir, Your Honor. Six years ago. Right. It was in 2023, Your Honor. Was the warden in Abington or Roanoke on this kind of a thing before a jury? Well, Your Honor, I don't really think that that, whether the question of whether or not— But you just said something about it having a jury. I understand, Your Honor, but I don't think— You're going to jerk the warden over to Abington? Do you know how far it is from Abington to Keene Mountain? I understand, Your Honor, but I don't think the question of whether or not— Was it Roanoke to Keene Mountain? I understand, Your Honor. I don't think the distances between Keene Mountain and those cities are before the court, nor is whether or not it would be smart for a plaintiff lawyer to try a case in front of a jury in front of those— Can I ask you a question? Assuming that bail applies, what's your best argument that the warden or the prison hadn't offered a reasonable justification for this strip search policy? Right. Okay, so there's no justification for the second search. Basically, the court can look at the second search in making that determination. And when you talk about the second search, these people are searched both before and— the inmates are searched both before and after they go into the Zoom meeting room. That's right, Your Honor. And while they're in the Zoom meeting room, they're in there alone with nothing other than a stool and a monitor that are bolted down, and they're observed the entire time, correct? They can be observed the entire time. And yet, they're strip searched a second time after they leave. Correct. Okay, now what were you going to say about that second time and how the justification is not reasonable? And what else? One other thing I would add to that factual overview, which is undisputed largely, except maybe in terms of characterization, is that everyone that goes to the no-contact visits passes through a section called Picket Control. And folks go to different places when they pass through Picket Control. Some of those places are for religious services. Some of them are for educational services. A lot of them involve actual contact with people coming from outside the prison. The one that doesn't involve any contact with people coming from outside the prison are those who go to the no-contact video visits. Everyone else is subject to strip search that goes through Picket Control, but everyone else that goes through Picket Control is not subjected to this policy of strip searches before and after no-contact video visits. They are doing that now. When did they stop doing that? Well, they stopped doing it about 60 days after they did it. When did they stop doing it? In 2020 or 2023? Yes, sir, but a constitutional violation.  You just said that you're acting like they're still going on. No, I'm not acting like they're still going on. And the warden did it of his own volition for 30 or 60 days. Yes, sir. And that's it. That's right, Your Honor, but the Constitution, this court's recognized that the Constitution can be violated in a matter of seconds. It doesn't matter whether it only happened for 60 days or one day. If it's a violation of the Constitution, which is a question for the jury in this case, it's a violation of the Constitution. That may go to damages, and certainly it could go to damages the amount of time that it went on. But a constitutional violation that goes on for 60 days, I don't think this court wants to establish the precedent that it's okay for some number of days to violate the Constitution. You were also talking about the picket control area. Didn't the warden also say in his deposition that he was concerned about drug smuggling through the holding area where the inmates are kept while they're waiting for their video visits? No, Your Honor. I think that Warden Hamilton's testimony in this case, as indicated by the record, is that he had received some vague information that maybe, I believe Ward was maybe— He said intel. Some vague intel. I'm saying vague.  He said intel that maybe contraband was being passed through the no contact video visits. There was no specific evidence that it ever had been, and in fact no evidence was ever found when these searches were done that it ever happened. But that was—and what's important about that is Bell— But couldn't that have been occurring in the holding area before they went into the no contact video rooms? It could have been, but then it would have been discovered on the search going into the no contact rooms. So your quarrel is really with the search coming out of the no contact room? Yes, Your Honor. Okay. Right. And that's where Turner is kind of— So you don't have any problem with the first search? I don't think that the first—I don't necessarily agree with it, but I don't think that it's unconstitutional as a matter of law or anything like that. And the problem with the second search is that the inmate was, number one, alone in a room, number two, in a room where there were only two other things both bolted down, and number three, in a room alone where they could be observed the entire time. Number four, there's no contact with anybody else at all in that room. Is that correct? And if I could just— So, I mean, who's passing it? The guards? I don't— Yeah, if I could just try to answer that question, I think it addresses all the points. First of all, yes, the warden has a legitimate interest in controlling contraband. But if that limitation was— Not just a legitimate interest. He has the public interest in controlling it. This is a maximum security prison. I don't believe it's in the record whether or not it's a maximum security prison, Your Honor. No, I don't. You don't say what it is. Tell me what it is. King Mountain. That's not—the point is whether there is a legitimate— They put them out there in western Virginia to get them as far away from the populated centers. And even if it's not in this record, I'm sure it's in the public record. I understand. But the point is that Bell, whether it's a maximum security prison or not, does not give prison administrators indiscriminate leeway to search prisoners simply based on contraband. That's why there's a balancing test. The fact that contraband might exist exists in every prison. And, of course, there's a legitimate penological interest in controlling it. And that's why we have these tests to see if searches— But you're not trying to stop this. That would be a request for an injunction because it hadn't happened for years. And you don't want a declaratory because it's not going on. You want to get personal damages from the pocket of the warden for implementing this process for 30 to 60 days. Correct? I want the plaintiff is seeking damages for the violation of his constitutional rights. From the warden. Well, I mean, there's a warden— Well, the warden, and you've got the guy who's working, the squire, too. And you want attorney's fees under Section 1988 if you could get a couple of bucks from the warden. Well, Your Honor, if the warden has violated the Constitution or if Sergeant Squire did, then the law permits the recovery of damages and potentially for 1988 fees for the prevailing party. So we're just asking for what the law allows, Your Honor, in that regard. You know, at the end of the day, as we talk about whether Turner applies or the bail factors, and we can go through those factors on it, there's still that ultimate question of qualified immunity. And when you get to that, we just analyzed the constitutional violations, which you need for Section 1983. But the Supreme Court is very clear. You don't have to even answer that question. You just need to answer the question of whether this is clearly established. And to be clearly established, the Supreme Court has narrowed us down to almost finding cases just like this one. And I don't know of another case like this. Tell me a case that would—and I know that the district court may not have gotten to it, but it seems to be pretty straightforward. I mean, we can dance on this all day long, but ultimately that question has to be addressed as to whether this was clearly established. And what is the case that would say if it is a violation of the Fourth Amendment to conduct a stripped search of a person in a private setting by a member of the same sex both before and after no contact appointments? Where is that case? Well, Your Honor, I have 13 seconds. I still haven't answered Judge Thacker's question. I need you to answer mine no matter how many seconds you have, if you don't mind. Which I would like to do, Your Honor. What is the case? And, Your Honor, I'll have to reserve some of my time on rebuttal for this. I see my time is up. But to answer Your Honor's— What is the case? To answer Your Honor's question, I believe Bell, Turner, Logan, and even Robinette addressed that, give notice on this issue. They clearly established the point you're trying to make. That's your answer? I don't believe that the— Well, you have to have a clearly established constitutional right. Yes, Your Honor. And I do believe they answered that question. But Hope V. Pelzer teaches us that that right doesn't have to be so specific that the exact same set of factual circumstances have to be before the court, only that a prison administrator or someone working in that facility would have the opportunity to have notice to understand that they could be violating constitutional rights when they fail, when they implement a strip search policy that fails to have any rational connection to the stated purpose. And the second search is exactly that, which I will, when I get back up on rebuttal, try to answer Judge Thacker's question on specifically why that search is the problem. Thank you. Thank you very much. Ms. Switzer? Good morning, Your Honors. May it please the Court, Kaitlyn Switzer on behalf of the Defendant Appleese, Warden Israel Hamilton, and Sergeant Squire. The District Court correctly held in this case that the temporary strip search policy at Key Mountain Correctional Center was reasonable and that the searches did not violate the plaintiff's . . . Why was the second search reasonable? Well, Your Honor, Warden Hamilton explained in his deposition that the purpose for the second search was to catch any contraband that may have been left in the room and not caught on the initial search and picked up by an inmate on the way out of the room. So when questioned about the need for the second search, he felt that it was necessary . . . So in case their first search wasn't thorough enough, they didn't do a good . . . the jail missed something and somebody . . . and then they missed . . . they weren't watching on the video to see that people were leaving contraband in the room, so they missed that a second time. And they're going to search . . . strip search them a second time. Yes, Your Honor. It's not about whether or not . . . I mean, if the . . . if the . . . if the warden in the jail had intel that there was contraband being passed in these no-contact rooms where only a single inmate was in there at a time, it seems to me like that would make their video surveillance of that no-contact room increase. They had the capability to observe the individual the entire time they were in the room, right? Yes, I believe it's in the record. I mean, if they thought that there was contraband being passed, you'd think that they would be looking at them, have their eyes on them that entire time they were in the room rather than strip search them when they came back out. Yes, Your Honor. The record does not . . . Warden Hamilton in his deposition wasn't asked, I think, specifically to explain why he chose to use strip searches versus perhaps an alternative means. But the test here under Bell isn't even necessarily whether there was another avenue to try to intercept this contraband, but whether or not . . . But I guess it goes . . . my question goes to whether this was a reasonable justification given that the person was alone in the room, no contact with anybody else, no ability to move anything, to hide any contraband, and the jail was watching them the whole time. I don't understand how it's reasonable then to strip search that person a second time. And I guess you're saying that the warden said it's because we might not have done a good enough strip search the first time. Well, it's not necessarily about the strip search being good enough. I think he explained . . . I thought that's what you said, they might have missed something the first time. Well, of course a strip search involves only a visual inspection. So to the extent an inmate successfully hides contraband inside of their bodies or on their person in a way to evade detection in the first search, which is only visual . . . Well, you wouldn't get it in the second search either because they didn't do a body cavity search, did they? Well, not necessarily, Your Honor. And that's what Warden Hamilton . . . Not necessarily what? Well, Warden Hamilton explained that the . . . Did they conduct a bodily cavity, all those things you just mentioned, where you could hide it? I thought it was a visual, no-contact type search. Yes, it is. So it's the same thing. Everything was visual. That's correct. It did not involve any touching or inspection of . . . But the point I want to make clear is that the first search is no different than the second one because there's nothing done in that second one that's different than the first one. Correct, but it could be a different inmate. So what he explained was that the information that they had is that . . . A different inmate? The information that they had is that these inmates, these inmate informants, reported that the inmates were leaving the drugs in the video visitation room for another inmate to then retrieve. So Warden Hamilton explained that his thought was . . . I know, which is why they searched them before they went in the room, so they wouldn't have contraband, and why they watched them the entire time they were in the room so they couldn't leave contraband for the next person. Warden Hamilton explained that he was concerned that they were missing the drugs because . . . Right. That goes back to them not doing a good enough search the first time or being observant enough while they're in the room. And that might be a reasonable . . . I mean, maybe they want . . . I mean, that's reasonable to want to assure that there's no contraband in the facility. Certainly. And so he explained that part of the reason . . . And this goes to Judge King's questions about the security level at Keene Mountain. He explained in his deposition, Warden Hamilton did, that Keene Mountain Correctional Center houses Level 4 inmates and Level 2 inmates, and that this video picket area . . . Well, what's Level 4 and Level 2? What's that tell us? Well, the different security levels with different restrictions on the inmates in this area. Okay, so is Level 4 maximum? Is that the point? I think there's also Level 5 and Level S. That's not in the record here, but it is a higher security level than Level 2. And this area of the prison is one of the areas where inmates leave their housing units and have access to other buildings. And he explained in his deposition that the problem was is that they had drugs being passed throughout the facility. So the goal here was in response . . . . . . or something like that? Maybe I misread that. Yeah, I don't have a specific where he mentioned the . . . He just references generally the video visitation area. So I can't say for sure whether he meant just the room or the entire picket area where Sergeant Squire also had the inmates waiting. So I don't want to put words in Warden Hamilton's mouth there and what he meant by that. The difficult part of at least that issue I think is keen because it seems as though the warden is relying upon this anonymous tip, whomever, to someone to say it's happening in a room that's a no-contact room. There's an officer in that room, and I cannot believe they don't sweep that room and check out to see what's in there. I don't know. And you just have this person there. The difficulty is in agreeing with you, how do we write a case that essentially would be saying, because the warden said it, it must be true, when there's really nothing other than the warden said this was happening, based upon an anonymous tip, which kind of takes you another step down the road because we don't know the credibility of that tip of the person who made it. I mean, at the end of the day, all of those things are there. The courts go out of their way to try to work with prison systems on this to take the word of the warden. But here it just seems a naked word of the warden. I have an anonymous tip that this is occurring, and yet the circumstantial situation is maybe they dropped it in there and left it there. Maybe this happened, but none of that is really evidence here. There's nothing here that you can say other than speculation. Sure. Well, I guess in response to that, I'd point the court to Florence and Johnson v. Robinette, where this court and the Supreme Court has said that a search in this context is reasonable absent substantial evidence in the record that the response of prison officials was exaggerated. And here there's not substantial evidence in the record that this was an exaggerated response to the concerns that Warden Hamilton had. So we have to trust the warden on the face of this record? Here, the justification, certainly, because there's no evidence in the record of any other justification for the searches for a more nefarious purpose. With these anonymous tips, he said it was intel. Yes, he said intel from the intel department based on information from inmate confidential informants. So inmates, he said multiple inmates had reported that they were using this area of the prison. And it's certainly true. I believe my colleague noted these inmates aren't identified in the record. But the warden has an obligation to take this information and use it to stop the spread of the drugs if he can because, of course, he has an obligation to protect the health and safety of the inmates. But is this a reasonable way to do it rather than go in and sweep the room before you send the inmate into the room alone instead of strip searching them when they come back out? Yeah, I mean, it's defendant's position that, you know, Warden Hamilton's discretion as a prison administrator that that was necessary. And certainly that does require some deference from this court to the judgment of Warden Hamilton. But both this court— And after he did it for 30 or 60 days, they hadn't found anything. And he stopped this thing. That's correct, Your Honor. He testified in his dep— He gave his best shot. And it didn't work. That's right. Yes, Your Honor. And he's the warden. He was acting— And that's what I'm— In this situation, you trust the warden in an institution like this with these kind of prisoners. You have to. Yes, I mean, he was acting based on specific information and a specific concern. But to get to his trial, you're calling there once a trial of the warden to be held over at Abington or Roanoke 150 miles from this prison, I think. You've got to get past a qualified immunity claim, as Judge Wynn mentioned. And how could you ever do that in this situation? That's correct, Your Honor. I mean, to answer Judge Wynn's question about what case would have put the warden on notice that this was unconstitutional, the answer is there isn't one. You know, the weight of authority is that prison officials are given substantial deference in this area, that he has an obligation to— Your Honor, the District Court never reached that issue. We didn't get to the qualified immunity issue, but I'm not sure we need to send it back for it to do it if it's a question of law, particularly when you're addressing a clearly established problem of that. The Supreme Court has put us in a position of, you know, just saying, you know, the whole constitutional issue that we spend all the time on, the court has permitted, and even seems like it's encouraged to just say, well, even if it was violated, it wasn't clearly established. The big problem I find with that is it won't ever be clearly established if that's what you do in every case. When are you going to look at it and determine whether that is a constitutional violation or not? But at the end of the day, even if we do, there is still the qualified immunity question here, and I mean, it seems pretty clear to me where the Supreme Court has gone with that. I think we could go all day long and say this is a violation and it's the worst thing in the world, but at the end of the day, this thing doesn't seem to be able to survive the clearly established problem of qualified immunity. That's correct, Your Honor, and this court, as you noted, can decide that in the first instance. Have you argued that we ought to skip the constitutional violation or assume it and then go to the clearly established problem? No, Your Honor. I mean, we're asking the court to find— You're trying to get us to decide it on the first problem. That this is reason— That's where we are. Yeah, yeah. All we've got left is the 1983 claim. That's correct. Against the ward, against Mr. Squire. That's correct. But he wants the ward. And it's going to come up. I mean, even if we rule in his favor, it's going to go right back to that court. That's the district court, and there's no way you're not going to address qualified immunity. There's no way you're not going to eventually get this up. So it seems like, you know, we're having a wonderful discussion, but that's before us, and no, you didn't bring it up. And what perplexes me on these cases, when you bring them, is why didn't you ask the district court to do it? I mean, he stopped and didn't go there. He said, Your Honor, if you would, we would ask that you also address the second prong of this. And then it puts it clearly before us, but there are cases in which we have addressed this because we've determined that really is a question of law. That's correct, Your Honor. And I mean, Johnson v. Robinette is one of those cases. There were seven strip searches that issue there. But you're about to tell me why you didn't ask the district court to do it. Well, we raised qualified immunity in the district court, but as Your Honor knows, the district court elected not to reach that. I mean, district courts are pretty openly hearing, asking you, just at least as Your Honor, you know, we raised this, would you? And then he could say, no, I'm not gonna do it. Oh, yes, I will. But it seems to me that that's dispositive, this case. And we're just, we're up here, and we can go round and round all day long on a constitutional violation for which, depending on how we rule, it's pretty important law, the constitutional aspect of it. But at the end of the day for this client, it's gonna end up in qualified immunity, and the question is whether it's clearly established. And then I don't think seeing bail in Turner as clearly established is gonna be enough. If it did, there are a whole lot of cases that are clearly established that the court has bailed otherwise on. That's correct, Your Honor. It's too high a level of generality here just to say that the Fourth Amendment itself, or this general right to be free from unreasonable searches and seizures put the defendants here on notice. And what's your best case that we just trust the warden regardless of what the warden says, regardless of how unreasonable the justification may be? Well, Your Honor, I think the most helpful cases here are Bell v. Wolfish and Florence v. Board of Chosen Freeholders from the Supreme Court, particularly Florence, because there the challenge was to an administrative policy of searching every arrestee upon admission to two different jail facilities regardless of any suspicion of that individual inmate, regardless of what the offense was that the inmate committed or was being arrested for or suspected of. And the administrative policy was upheld because of, as the court emphasized, the concern for curbing contraband in a prison and that the court shouldn't place itself. And I understand that concern, but it can't simply be a justification standing alone. It has to be a reasonable justification. That's correct. Our position here is that the warden's explanation to the extent he was given an opportunity in deposition to explain his thought process behind being concerned based on his experience with how small the drugs are that these inmates are smuggling and the creative ways that they can hide them, places on themselves. Sergeant Squire testified he's seen them pass things to each other underneath doors a lot easier than you would think. So based on his experience in the prison, that's his explanation. And we posit that that's a reasonable explanation and that based on the precedent from this court and the Supreme Court, that that's sufficient because that determination or that discretion is necessary so that wardens have the ability to make judgment calls without necessarily having where discretion is necessary, having to choose between taking measures that the warden believes is necessary to protect the health and safety of the inmates versus not strip searching an inmate on the way out of a room and only strips... Why did he stop doing it? Why did he stop implementing the policy? Yeah, he testified in his deposition that he did not recall, but based on the fact that no contraband was found, that he thinks that that's probably why he stopped because his particular purpose here was just trying to intercept the contraband that they'd seen a spike in. In particular, defendants presented evidence below of an increase in drug overdoses. That's what makes this case somewhat more difficult. I mean, if he was out in the yard, there was this opportunity for seeing really low that an inmate who goes in a room, just this room, got an officer sitting in there, no one but he's in there. He has no contact. It's a video-type contact with the visitation. He comes out and he strips her. And that's kind of hard to understand is I know you can probably posit, well, maybe he had something on himself and he gave it to someone. Well, that's not in that room. I don't know how that happens unless they walk. But it seems like, and Judge Stacker alluded to this, that if that is the problem of being in a hall, then don't let them walk down a hall together. I mean, it seems like it's coming from somewhere else. But to simply go into a room, look at a video and come out and be strip searched, and the Supreme Court has made it clear that prisoners do have that right. The Supreme Court law says you can't just search a person and strip search them for nothing. I mean, that violates even their rights. I mean, they have that full commitment right on it. So that's the problem. And as Judge King alluded to, writing that opinion is difficult to get there without concluding, well, the warden got to do his thing. The intel people apparently talked to somebody and it related to the warden who then implements this policy that the defendant contends is in violation of the Fourth Amendment. And I don't think we want to write an opinion to say that he can just make that without anything else. Your Honor, it's... Other than speculation. It's true that, you know, for no justification or an impermissible justification, inmates absolutely have a right to be free from searches that are targeting, harassing, for the purpose of intimidating them. Yeah, that's a given law. That's a given law. Absolutely, but there is no evidence in this record that the purpose for the searches was for anything other than a targeted concern about the specific room, and that was in response to evidence in the record of substantial drug overdoses throughout the prison. What you're saying is it wouldn't be speculation. The warden credited the information and adopted this policy. Maybe it was an experiment or something, but he did it for 30 or 60 days. They don't even know how long it lasted. Yes, Your Honor, he did it. And then he terminated it. It was unsuccessful. But do they want to find him liable to the prisoners for this kind of thing? I assume that time has expired. But that's the lawsuit here, and it's in the appeals court of the United States to figure it out. But your response is, I agree with that. That's correct. Thank you, Your Honor. And we appreciate your help. Mr. Carroll? Yes, sir. May I please the court? Respectfully, I don't think that the Constitution permits wardens to experiment. Well, that's what the question is here. But as my friend Judge Wynn mentioned, it didn't go off on the constitutional determination. It didn't get to the second prong. Yes, sir. I just think that wardens are afforded deference under precedent, but not blind trust. And I really want to answer Judge... They have to be afforded deference. Deference, but not blind trust. And that's why the Bell and Turner test exists. It's not blind trust. He testified that he got the intel. He testified that he got the intel, and he was under oath. Yes, sir, and Turner creates a... But you want us to assume that he lied about it. I'm not saying that he... I guess. You don't have to assume that he lied. Well, then we assume he told the truth. Your Honor, you... You assume he told the truth, and you're stuck with that. Your Honor, I have short time. I'd like to be able to answer your question. I think what you're saying is not that he lied about that he received this intel, but that his response to that intel was not reasonable. Essentially, it was exaggerated and therefore unjustified. Turner tests the deference. Bell tests the search. Here's why the second search is so unjustified, based on the facts as we understand them. The second search is your... You think that's your best argument. Yes, sir, and this is why. What's your best argument about the being that clearly established constitutional violation? Well, I'd like to answer that one, too, but I think it's important... You don't have any argument about that. I do have an argument about that, Your Honor, but I think it is important for the court to address the constitutional issues so there's guidance. And so I'd like to address that part of it, and then I'll address the qualified immunity with the time that I have. The inmate is searched going in. There's strip search going in. The only way they can take contraband in is if they have it in their body cavity. It's admitted that the strip search doesn't get that. So it's possible somebody has something in their body cavity. They go into the room. The visits are staggered. There's no possibility for any contact with any other individuals as they're going in and out of the rooms. They're escorted to the room by security. They're locked in the room. The room has a bench bolted to the floor and a TV screen bolted to the wall. It has live camera surveillance that's possible and a window in the door. The only way that contraband gets into that room is if it's in the body cavity. That would require that the inmate then takes their pants off, I suppose, and removes contraband while on video and possibly being monitored through the window. One would think the jailers would notice that. You would think. And if they didn't notice it, where can they hide it? On a bench, a stool that's bolted to the floor. I don't know how they would be able to tape it to the bottom of that, or I suppose stuffing it behind the TV screen on the wall. That's it. If an individual comes in, a correctional officer, comes in to escort them out, all they have to do at that point is look to see if anything has been put behind the TV screen or under the bench. And in fact, that's a more effective measure because you would actually find it then, and you wouldn't find it on the way out with another inmate presumably who got it and put it inside their body cavity. That would be the only way for it to be detected on the way out. So the second search, not because the warden is lying and not because the warden is trying to harass or sexually assault anybody or anything like that, the second search just doesn't serve any legitimate penological purpose. It just simply does not. So it really goes to the question, don't worry about your time. You mentioned that we sometimes let litigants or lawyers stand up here for a long time. Judge King will allow you to talk as much as he wants you to talk, or at least. So don't worry about that. We're gonna satisfy ourselves on that. But in this case, it just seems like it becomes a closer case when you look at the totality of the circumstances and describe, first, there is a huge problem. You're in a prison setting. They are exchanging drugs. Prisoners are as creative as anything in the world, more creative than lawyers, and can do all sorts of stuff. The warden gets information. It seems implausible. I will agree with that. It does. But is that the test? If the warden believes it and that this would help, it seems as though the ultimate question may come down to, is it a reasonable thing for him to implement a policy? And the temporalness has been emphasized, but it seems to me if you do so for 60 days or 90 days, the lesser period of time, it seems to be a tighter situation. But your case is built around a fact, which I think the facts are there. It seems like it's very implausible that you can do this. But this warden is trying to deal with a major problem there. This is where the courts go on. This is the kind of language you're getting on. And so get back into, I don't know why the Supreme Court decided that you don't even have to answer this question. You can go to that clearly established. I brought that up several times. The Supreme Court's done that. I actually think it's with cases kind of like this where it is so close that if you answer that question, you're going to make a law that may just be interpreted as whatever the warden says. And the court ought not be put in a position like that. So you don't have to. You can just say, assuming for the sake of argument it was a violation, it wasn't clearly established, either day. Sometimes you do want the question answered. Sometimes you don't because it may allow you in another case with a different set of facts to escape the law and the precedent that can be set in this case. Do you disagree with that? Sir, first of all, I wholeheartedly agree that this court is bound by the two-step process. But I also think this court has a responsibility for the reasons that you point out. I want to be clear there. When you say bound by the two-step, the Supreme Court has made it clear. We don't have to do step one. That's the point I'm making. The Percy case makes that very clear. I agree with that as well. And that was the basis I'm telling you. I didn't understand it, to be honest. But when I see a case like this, where it's so close, it kind of makes sense that you might not want to deal directly with that question now because this is not the case. Sometimes you get bad facts that will make bad law. And if that's the case, then maybe go into the clearly established, which ultimately is going to be reached, whether you win or lose it for this client. It's going to be reached. This is a great case. You're right. You're right about that. The court says you may go to the second step, but not that you must go to the second step. Well, they said, Saussure is the name of the case. It says we can decide on either prong first. Yes, sir. Whichever prong we want. And I encourage the court to decide. We can do that. I encourage the court to at least decide the constitutional prong here for two reasons. One, that's all the district court below addressed. And so it's a great opportunity for the court to do that. Two, the facts are very good that the second search, yes, implementation of searches, even if it's implausible, fine. But there's no point in the second search. It doesn't serve any legitimate penological purpose. And even though it was only in place for 60 days, am I correct that he was strip searched 26 times? He was strip searched 26 times, and some of his companions were searched more, the record demonstrates. It was, that means he was, it was twice when it occurred, so it must have been 13 times. 13 non-contact visits with his mother. 13. And they said 30 to 60 days, like they didn't even know how long they'd tested this thing. Well, he didn't even know whether it had any impact or not because he testified that he was unaware whether he even reviewed the data. Yes, sir. That's right. You got the warden's deposition here. That's a big step. And the second factor, Your Honors, on that point of turn out. But he terminated the thing when it didn't produce any results. He terminated it. He doesn't know why. He tested it out, and it didn't work. It didn't find anything. You said he didn't know why he terminated it? He said he didn't know why he terminated it. He said he didn't remember, did he? He didn't remember. He didn't remember whether or not he'd ever reviewed any. He didn't remember. He didn't remember whether he'd reviewed any documents as to whether it had any impact whatsoever. He didn't remember. He didn't even know whether any contraband had ever been found on any of the searches. So that, I think, reinforces that it didn't really serve a legitimate penological purpose if the answer is I don't know whether it did anything or I didn't even bother to really look. And just to Judge Thackeray's point, I'm sorry, I'm taking some liberties with Judge Wint saying not to worry about my time. Well, I'm not in charge. That's me in charge. The second term... I should be in charge, but the lawyer just kind of run over me. I'm so sorry, Your Honor. If you want me to stop, please tell me. I want to just answer the qualified immunity question really quickly. But the second Turner factor... Well, you can answer it. I can, Your Honor. The exercise of the right to bodily privacy means you have to choose between visiting with your mother and being strip searched for no reason. That's the second Turner factor. And the qualified immunity test is... There has to be a justification. And there are plenty of cases, even Robinette, it says there can't be an exaggerated response. The right was clearly established at the correct level. Strip searches must be reasonable under the circumstances. Bell requires the need for a particular search. Turner requires a rational connection rather than an exaggerated response. And Logan made clear in this court that you can't just indiscriminately search people when there's no discernible relationship to a security need. And that involved a case where a person, unlike Florence, a pretrial detainee was on a DUI but wasn't going into the general population, wasn't having contact with other inmates. And this court instructed, which is still good law in Logan, that there was no rational justification to search somebody who didn't have... But inmates in penitentiaries have their rights circumscribed. Yes, sir, that's right. It's not a pretrial detainee case. To a very substantial extent. And your time is about out. Yes, sir. I think my time's well up. We appreciate your work. Thank you, sir. Very much. And we appreciate the Assistant Attorney General's work. Glad to have you all here. Thank you very much. And we'll come down and greet you, as we do in our cases. And then we'll call the next case.
judges: Robert B. King, James Andrew Wynn, Stephanie D. Thacker